And now we'll have Judge Livingston rejoin the panel. And the next case on our calendar is Melinda Mitchell and others versus the City of New York. Good morning, counsel. Good morning, your honors, and may it please the court. My name is Jeffrey Rothman. I represent the appellants. I'm co-counsel for the appellants in this case. I've reserved two minutes for rebuttal. As your honors are aware, this is our second trip to this court in this case, Judge Pooler having been on the original panel that heard our first voyage here. Unfortunately, following remand, the district court once again erred, this time in granting the defendant's summary judgment motion on qualified immunity grounds based upon District of Columbia versus Wesby. The district court erred in failing to consider critical distinctions between Wesby and the case at Barr. For example, in Wesby, the police had reports from neighbors, including a local politician, that the property in that case was vacant and also determined through diligent efforts that the purported host of that party really did not have permission to be throwing the party and they actually reached the owner of that property who said that the people who were there did not have permission to use the party. In the case at Barr, despite this property having been on their radar for over a month since Lieutenant Caesar had gone in in December of 2010, the defendants did nothing at all to check the ownership status of this property. They didn't call the number on the real estate sign that was posted prominently in the front yard. They didn't look in any city database to see who was the owner. They didn't contact the New York City Law Department or the NYPD's legal bureau to say we're concerned about parties here. Maybe it's a nuisance, start a nuisance abatement proceeding. They didn't even, on the date of the incident, when one of the officers said he was concerned because of electrical wires running to the neighboring property, they didn't even go and knock on the neighboring property to see whether or not it was owned by the same person. You're now talking about arguable probable cause, right? For the qualified immunity analysis. Yes, that is the analysis. If we go with the district court's disposition, and that's a different standard than probable cause itself, so even setting probable cause aside for the moment, they did get information that there was not a single, people were running away or attempting to leave when they came into the home. There was not a single person who came forward with any information when there was a request, whose property is this? Why isn't that, there were the extension cords going next door for sale sign at the front of the building, heaters in the building late at night, 30 people there. It has very much a similarity to Wesby on some facts. Why isn't that enough for arguable probable cause? Well, there's a very important distinction with Wesby in terms of the way they entered this property. In Wesby, they knocked on the door and somebody let them in, they walked in with consent. Here they smashed their way into the apartment through the rear door with no exigent circumstances and no consent, clear violation of the fourth amendment. We didn't make an issue of that in this case because we have a standing issue. Our clients don't own the property, but as part of the totality of the circumstances that this court will look at and evaluating whether or not there was, in this case, arguable probable cause or probable cause, you can consider the fact that they burst in there and began barking at people and speaking at them aggressively and threatening them. Harvey Mitchell testified a few of the officers had their guns out. It's certainly no surprise under these circumstances that people might be hesitant to say who's running the party or who owned the property. In addition, some people like my clients did not know. They were invited there by the DJs. They came. Melinda had gotten a text blast that there was a fun party going on. They went to the party, as people often do, without knowing exactly who the owner was or who was hosting it, just that there was a party there. It does draw a distinction with Wesby that doesn't work in your favor, which is that in Wesby, the authorities knew that the partygoers had a basis to believe they had entered at the invitation of a lawful occupant. It's just that the person they were relying on didn't have authority to grant them entrance here where no one is telling the police, none of the party attendees is identifying who gave permission to enter. Doesn't that add to the arguable probable cause for the ensuing conduct? No, Your Honor. None of the people who were at the party had any duty, and in fact, they had a right under the Fifth Amendment to not speak to the police. No, but we're looking at the totality of the circumstances here, and you've got circumstances that from the outside look like a trespass because the circumstances are so suspicious and they're not mitigated by anything that happens inside. But Your Honor, if you look at the facts in the light most favorable to the plaintiffs as is required on the defendant's summary judgment, there is nothing suspicious about these circumstances. Right, but you have to be able to show that the facts looked at in the light most favorable to you would not allow any reasonable officer to think he had probable cause. Well, that is correct, and take another important distinction with Wesby. In Wesby, the stories that were given by the party goers were filled with holes and contradictions. Here the stories told by the officers were filled with contradictions. Number one, you have three of them committing perjury on 14 separate trespass affidavits stating entirely falsely that they had an affidavit on file from the owner or managing agent making them the custodian of the property, allowing them to enter the property and decide who's a trespasser and who's not. You then have in their sworn testimony one of those officers saying, well, I thought it was city-owned property, and if it's city-owned property, then that equals an FTAP property even though the FTAP program is only for private owners. You have another one of the officers, Officer Schussler, Harvey's assigned arresting officer, who says he was told by his supervisor, Lieutenant Caesar, that the bank owned the property and that on Monday, this was a Saturday night, on Monday the bank would fax over the affidavit that was required for him to fill out his sworn statement. The arrest decision-maker, Captain Galata, said he thought the realty company owned it with no basis whatsoever for that, and it flies in the face of what anybody would expect when you see a realty sign. Normally a realtor is selling it or renting it for the owner. Now, it's possible the realty company owned it, but he had no basis for that. These officers had no basis for any of the things they said, so if you look at the facts and the like, most favorable to us, you have officers who broke into this property with no knowledge of who was the owner. They saw a party that was warm, with heat, with furniture, Harvey testified about love seats and a bar and music, all sorts of things set up and it looked nice with water running, began aggressively telling people, answer my questions or you're going to be arrested, and then arrested everybody in retaliation for the fact that they didn't get the answers they wanted. And Captain Galata said, if he- But as you said at the start, the officers may have lacked exigency, they may have lacked information, sufficient information as to whose property it was when they went in, but your clients don't have standing to complain about that, because if they were social guests, they could have established standing if they could make assertions that gave them the status of being a social guest, but they're not claiming that. They were in the building, so then the officers come in, but that's not what you're focusing us on. We're just focused on was there probable cause at the moment they seized your clients, or arguable probable cause, to believe there was a trespass. And don't we consider the earlier visit then, where an officer comes in and there's no furniture in the place? That wasn't the case. If you look at the facts in the light most favorable to the plaintiffs, the original panel said, despite the fact that there were signs of use, and there were two people who were in the property on December 4th when Lieutenant Caesar went in over a month before, she just surmised and conjectured that it was abandoned, and never did anything to follow up. Despite the fact that Captain Galata said he was under the belief that there were parties there routinely, nobody followed up, no police officer or police supervisor did any police work to actually deter, and qualified immunity is not meant to protect officers from liability where you have this sort of plain incompetence and these lies. Qualified immunity doesn't protect officers who knowingly lie about material facts about a trespass arrest by perjuring themselves on trespass affidavits. Were there affidavits on information and belief? The information and belief was based upon a false fact. They said on information and belief, we are the custodians of the property because we have an affidavit. They made a factual averment that they had an affidavit from the owner, which didn't exist at all, and it's conceded by the defendants. It's in the record. They stipulate that it was not on the date of the incident. And I ask your honors to take a look at footnote 7 to our moving brief, which is a very long footnote that gives quotes of the testimony of each of these three officers who filled out each of these 14 perjured affidavits, and I think you'll see that their testimony is absurd. And there's no way to look at these affidavits as being anything other than perjury. And the reason why they did it, if you look at the facts and the like, most favorable to us. The most obvious explanation is that they had arrested everybody out of pique because they didn't get the answers they wanted, and then scrambled around afterwards to try and come up with some sort of justification for these mass arrests, and this perjury was part of it. In addition, Melinda's arresting officer, Officer Brenazzi, admitted that initially his supervisor, initially they were told to make a trespass charge on the arrest report, but his supervisor said that because they couldn't find out who the owner was, she was not to have trespass put on her arrest report. So he admitted that there was knowledge that the trespass arrest couldn't hold water here. In addition, I'm a little bit over time, but in addition, in the panel's first decision, Judge Shindlin's opinion in Davis versus the City of New York and its discussion of New York v. Brown, and the fundamental element in a trespass arrest that before you make a trespass arrest, you have to know that the people don't have a right to be there or have a reasonable basis to make that conclusion, and there was no basis. The first panel summed it up quite well and said, a Pelley's mass arrest for trespass on this record could easily be found to have been based entirely on baseless and unreasonable conjectures and assumptions as to the ownership of the property or its FTAP status. Thank you. Thank you. I have reserved two minutes for rebuttal. We'll hear from the City. Good morning, Your Honors. May it please the Court. Melanie West for the Appellees. In light of the Supreme Court's 2018 ruling in Wesby, this Court should find that the arrests in this case were supported by probable cause or, at the very least, by qualified immunity. Counsel, can you deal with the argument made by Mr. Rothman about purged affidavits from the police officers? Certainly, Your Honor. The FTAP issue is a red herring in this case. Nothing flows from the police officer's mistaken belief that these were FTAP buildings. That's not an element of the charge of trespass. That's not an affidavit that didn't exist. The officers testified that they didn't understand what FTAP meant. They believed, mistakenly, that it meant variously a vacant building or one owned by the City, and they believed that the affidavits to support that would be forthcoming. This was at 2.15 or something like that in the morning. They relied on affidavits that didn't exist. Is that correct? I believe, Your Honor, that their testimony was that they thought the affidavits would be coming, and then they never did. But they relied on them in their own affidavits, even though there were no affidavits on which they relied. Yes, they were mistaken, and there's no dispute that these are not FTAP buildings. So is that perjury? I don't think so, Your Honor, because- What do you think it is? Well, it was a mistake. The police officers mistakenly believed that they had the information coming, so they filled out their paperwork in advance. And the reason that it's not plausible to infer that it was perjury is that nothing flows from that. They didn't support their arrests to establish that this was an FTAP building, because that's not required. Do you think even officers who file, if not perjured, false affidavits are entitled to qualified immunity? Your Honor, the question of whether or not there is probable cause or qualified immunity is an objective inquiry as to what a reasonable police officer on this scene could infer. And these reasonable police officers filed affidavits that were not truthful. After the fact, after the arrest, and those affidavits- What was they held before? If the affidavits had some connection to their basis for arrest, perhaps, Your Honor, but that is not the case here. This is a group of people that were arrested in a home, and here are the undisputed facts about the situation. The home was sparsely furnished with an empty fridge, empty cabinets. Melinda Mitchell testified that she wouldn't necessarily say that anyone lived there based on what she saw at the home. Who was that? That's the plaintiff, Melinda Mitchell. Did Cesar go there a month before? Yes. Not follow up? There was no reason for her to follow up at that time, Your Honor, because the woman who called 911 then didn't want to pursue- But there was a real estate telephone number on the front lawn. Did anyone ever call that agency? No, Your Honor. Anyone in the police department ever call once to find out the owner? No, Your Honor, so a month before, nothing came of that. There was nothing to pursue. And then at this time, yes, we have a real estate sign in front of the home. It's 2.15 in the morning. Real estate sign was there more than from 2.15 in the morning. It was there for a month, wasn't it? But there wasn't an ongoing investigation into this building, Your Honor. There was some knowledge by some of the police officers that there had been problems at this location before, but there was no ongoing investigation. Did anyone do a search of records to find out who the owner was? Not at that time, Your Honor. Did they ever do it? To the best of my knowledge, somebody did call the real estate, the sign on the real estate number at some point after the arrests. But there's nothing in the record to indicate what came of that inquiry. Let's say it's not malevident. They're plainly incompetent, these cops, and you want to give them qualified immunity. The inquiry that this court has to address is whether a reasonable police officer on the scene could have inferred that the people at this home knew that they didn't have permission to be there. They were trespassers. That they were trespassing. What are you relying on for that? The home was sparsely furnished. There was nothing in the fridge, nothing in the cabinets. This is unlike Wesby where there was food in the fridge, toiletries in the cabinets. But similarly, the court emphasized that the home was sparsely furnished. It was heated by space heaters that were plugged into extension cords running to a neighboring property. There was a stripper pole, makeshift dance strip area, just like in Wesby, in this home. There was garbage on the floors, loud music that could be heard from outside the building. And Harvey Mitchell testified that he could hear music as he approached. People scattered when the police entered. They tried to flee, that's undisputed. And all of these things taken together, along with the fact that then when the police asked, who was the host of the party, who was the homeowner, how did people come to be here? It's undisputed that nobody offered any information for the police to investigate. Unlike in Wesby, where people identified who had invited them and the police were able to contact that person and ultimately contact the owner of the home, here no one offered any information. Nothing to undermine the police officer's reasonable inference that they did not have permission to be there. Are they required to answer the police in that circumstance? Certainly not, Your Honor. But again, as Justice Rodgers said, it's the totality of the circumstances. And here you have, just as in Wesby, a number of factors that indicate that the home was vacant and that the people there did not have permission to be there. And then you have people who are not willing to offer any information. So there's nothing to undermine the police officer's inference that they were trespassing. People in the home may have had a Fifth Amendment right not to answer, but have to answer. Of course. In answering the Fourth Amendment question, whether there's probable cause or the qualified immunity question, an arguable probable cause, the police are entitled to consider whether a group of people offer any explanation for why they're all in the place in the middle of the night. Yes, as part of the totality of the circumstances. So, Your Honor- Is it undisputed, there was something in the record about there being drugs on the floor. Is that undisputed or is that disputed in this record? It's undisputed that drugs were vouchered. There was cocaine and marijuana found at the scene, that there were baggies on the floor. I believe it's undisputed, although how many, it might be a matter of dispute. And then just quickly- Was it attributed to any one person? No, Your Honor. They were found on the floor and nobody was saying anything. And in fact, I believe that people were arrested for loitering for the purpose of using narcotics, I think was one of the charges noted on the sheet. Because Golotta, the police inspector, testified that he thought the drugs on the scene also gave probable cause to arrest. No one was charged with drug possession, though, were they? I don't believe so. How critical to your argument is the use of electrical support from another premises? I mean, I'm gathering from your argument that you're suggesting that basically this was property that even the owner wasn't using, and that that would add to the suspicion that the people were on the premises without permission. I mean, is it illegal to hook up your electrical equipment to another homeowner's? No, Your Honor, you're exactly right. Unless permission was given. Does the record reveal whether the other homeowner gave permission? There's no information about that in the record. So we don't know if it was illegal. Could have been permission. You don't know, Your Honor, but at 2.15 in the morning, it's reasonable that the police officers didn't go knock on the neighbor's house to find out. And it's, again, in context of a building that appears vacant for a number of reasons. There's very little furniture, it's filthy, there's drugs on the scene, there's a stripper pole, and then you also have extension cords running to the neighboring house, which the police officers took. Are they running into the garage? That wasn't clear to me. I believe that they were running from the garage into the neighboring house. So they were attached to the exterior of the neighbor's home, if it's clear in the record. It's not totally clear to me. I think that's right. Actually, into the neighbor's home, that would be a basis for inferring that the neighbor may have given permission. That's right, Your Honor, and it's not totally clear to me where it was plugged in. Your Honor, just to quickly address the second issue of the malicious prosecution claim that plaintiffs are seeking to revive. This court has already ruled on that claim and nothing in the Supreme Court's decision in manual changes the controlling law or got rid of the actual malice element of a malicious prosecution claim. The court there was addressing a threshold issue of whether the Fourth Amendment houses any claim for a pretrial detention, and nothing in that case changed the law or should change this court's prior ruling on the malicious prosecution piece of this case. I don't mean to harp on the circumstance, but I wouldn't think, this is going to show my own ignorance, that you could just take one extension cord and plug it into one outlet and therefore use everything in the house, you'd blow the fuse. Were multiple lines used or what? You said there were space heaters, so that suggests multiple appliances. Yes, one of the police officers testified that there were extension cords crisscrossing the floor. That's of the premises that they entered. I'm asking you what we know from the record because I couldn't find it as to how then they got access to the electrical service of the neighbor. I mean, I wondered whether they had to go into the transformer some way. Yeah, Your Honor, I'm afraid that I don't think the record gives us that information. There's just the testimony that the source of electricity was the neighbor's house. But if there's more detail in the record, I haven't found it, unless the court has any further questions. Thank you, counsel. Mr. Rothman, you have two minutes for rebuttal. Thank you, Your Honor. So in terms of the silence, the case that the initial panel had cited to by Judge Shinlin Davis versus the City of New York states as follows. Probable cause must extend to every element of the crime for which a person is arrested. And of course, the state cannot rely on a person's exercise of her Fifth Amendment right to remain silent in order to satisfy that burden. And especially, as I reiterate, in light of the way in which they entered and the abusive and belligerent manner in which they were treating these people. Who we have to remember, all these folks had done was go to a party, just in order to enjoy a Saturday night among some other people and dance and talk. And what happened to them was really outrageous. Tomorrow is the eighth anniversary of these arrests. And for simply going to this party, they wound up cuffed, brought to a precinct, put into a cage, and then charged with crimes. Now, Harvey was charged with drug possession, formally on a criminal court complaint, in addition to loitering for the purposes of using drugs. Now, that's not at issue on this appeal. The only basis that Judge Kaplan ever discussed was to trespass, justification for the arrest that the defendants put forth. But clearly, under Ibarra versus Illinois, and the need for individualized probable cause, there's no basis at all to link some small amount of drugs that were found on the floor with each and every person who was in there. In fact, Officer Schussler admitted at his deposition that the likely reason they wound up on the floor like that is when the police came barging in. Somebody who had these small baggages just threw them on the ground because they didn't want to have the drugs associated with him or her. As for the supposed stripper pole, Harvey said there was a pole that was in a room. And the only person who said they saw any topless person was Officer Schussler, who said he saw one topless woman. Now, I also note that if there was a pole, whether it be a stripper pole, Harvey said he thought it was just holding up the ceiling to make it look nice. But if it was a stripper pole, it was a fixture. It had to have been put in on purpose by the owner. Otherwise, you can't do the gymnastics that are necessary for a stripper pole or it'll fall down. So that has nothing to do with arguable probable cause. Now in Wesby, the court looked at the drugs and a whole different set of what Justice Thomas called debauchery going on there. There you had what appeared clearly to be a commercial striptease operation. Had women with money in their garter belts. Also looked as though, though he didn't call it a prostitution operation, but he talked about one bare mattress upstairs with a naked woman and men and a used condom. There's nothing like that here. On our fact, this is a nice, clean party. Everybody's there just enjoying themselves. The fact that one person, maybe more than one person, had some small trace amount of drugs in their pocket, that has nothing to do with trespassing. Go to any party in this city, somebody's got some drugs on them, any bar in this city. People use drugs in their own homes as well. Now, just to briefly address the malicious prosecution point, the only way that you can read Manuel versus Juliet and have it make any sense is to conclude from it that there is no subjective malice that can be required for a Fourth Amendment claim. Because the Fourth Amendment is a standard of objective reasonableness. The Fourth Circuit and the Sixth Circuit have already clearly held that, and that is the necessary logical and jurisprudential corollary to the decision in Manuel v Juliet. This court should correct the longstanding error in its jurisprudence. And even referring to this as a federal malicious prosecution claim, that's an, as I said in the brief. Just addressing that briefly, I might be sympathetic to the ultimate argument, but I'm having difficulty reading Manuel to get me there. I mean, they expressly declined to address the elements. And we have this decision in Lanning where we talk about the effect of the decision. We again don't directly address malice, but we seem to suggest that it's still a required finding in a malicious prosecution claim. It was indeed a narrow decision. In fact, Justice Alito chided the majority for not addressing that. He thought that it should have been, and it was part and parcel of the question on certiorari. The court only explicitly decided that the Fourth Amendment applies to these post-arrest, pre-trial wrongful seizure claims, and not the due process clause. But what that means, since the Fourth Amendment looks to objective reasonableness, is that you cannot have a subjective malice element as part of it as the Fourth Circuit and Sixth Circuit have said clearly, and a number of other circuits have said in similar terminology, but not as clearly and directly as the Fourth and Sixth that's cited particularly in our reply brief. After that, now I note as well that the initial panel throughout Melinda's malicious prosecution claim in quotation marks, because of a lack of malice, and that had never been briefed in front of this court. Judge Kaplan had initially thrown out the malicious prosecution claim because he determined that there was not a seizure. However, the combination of a stamp versus Long Island Railroad and Swartz V and Sona put together stand for the proposition that there was in fact a seizure. Stamp held that a desk appearance ticket, which Melinda received, initiates a prosecution, and Swartz V and Sona said that if you have to go back to court based upon criminal proceedings that were initiated by a defendant officer, that's a seizure. The two together create the syllogism, and there was a seizure. So for those reasons, Melinda's malicious. Post-arrest pretrial wrongful seizure claim should be reinstated, Your Honor. Thank you. Thank you. Thank you both. Very good argument. The last case on our calendar is on submission, so I'll ask the clerk to adjourn court.